IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

·FILED-CLERK
·U.S. DISTRICT COURT

2007 MAR 28  PM 3: 32

TX EASTERN-MARSHALL

BY_____

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN<br>CITIZENS, ET AL. | § | |
| | | |
| Vs. | § | CIVIL NO. 2:03-CV-354<br>CONSOLIDATED |
| RICK PERRY, GOVERNOR OF TEXAS,<br>ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

**1.      Introduction.**

The plaintiffs in these consolidated cases challenged the adoption of a new congressional

redistricting plan by the State of Texas.  The claims challenging the entirety of the statewide plan

failed.  The Supreme Court, however, concluded that the state violated Section 2 of the Voting

Rights Act when it created new CD 23.  We drew a remedial map in response to the Court's

mandate.  Various parties now request attorneys' fees.  We agree that some plaintiffs prevailed, and

we therefore grant their applications.  Others lack prevailing party status, and we deny their petition.

**2.      Factual Background and Procedural Posture.**

These cases arose in 2003 when the Texas state legislature replaced a court-drawn

congressional map with a legislative plan.  Various voters, office holders, interest groups and

municipalities challenged the state's authority to replace a map mid-decade, when the basis for doing

so was partisan gain.  Some of the plaintiffs directed additional challenges at specific districts.  After

a trial on the merits, this court, in a partially divided opinion, rendered judgment against the plaintiffs

rejecting all of their claims.

The Supreme Court vacated this court's judgment and remanded the case for further consideration in light of *Vieth v. Jubilirer*, 541 U.S. 267 (2004). In response to the Court's mandate, we asked for supplemental briefs and held argument in January 2005. We reinstated our prior judgment.

Certain plaintiffs appealed, and the Supreme Court noted probable jurisdiction. On June 28, 2006, the Supreme Court rendered its decision. *League of United Latin American Citizens v. Perry*, 126 S.Ct. 2594 (2006). The Court rejected the argument advanced by the appellants that Plan 1374C was an unconstitutional political gerrymander. *Id.* at 2609-11. The absence of an administrable test for partisan fairness factored centrally in the Court's holding. Id. at 2610. Likewise, the Court rejected the argument brought by the City of Austin and Travis County that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement due to the state's use of old census data. *Id.* at 2611-12. The Court also rejected the argument that the plaintiffs had proven a Section 2 claim in connection with the lines drawn in the Dallas/Fort Worth area. *Id.* at 2625-2626.

With respect to CD 23, however, the Supreme Court held that the evidence revealed a violation of Section 2. *Id.* at 2623. The Court found it unnecessary to consider the Equal Protection challenge to CD 25 because the Court had directed us to re-draw CD 23, and the Court assumed that CD 25 would not survive that exercise. *Id.* The prior judgment of this court was affirmed in part, reversed in part, and vacated in part. The Court remanded the case for the entry of a remedial plan. In response to the mandate, we issued an opinion dated August 4, 2006, and an accompanying order regarding special elections. We imposed Plan 1438C as its remedial plan for the violation of Section

2 of the Voting Rights Act found by the Supreme Court. The remedial order prompted these fee applications.

**3.      Discussion.**

Section 1988 provides that a court "in its discretion, may allow the prevailing party . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.[1]  A plaintiff "prevails" by receiving some relief on the merits of his claim. *Hewitt v. Helms*, 482 U.S. 755, 760 (1987). "[T]he plaintiff must be able to point to a resolution of the dispute which changes the legal relationship of the parties." *Texas State Teachers Assn. v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 792 (1999). According to *Garland*, "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." In *Garland*, the plaintiffs "prevailed" because they obtained a judgment which vindicated their First Amendment rights and materially altered the defendant's policy limiting the rights of its employees to communicate concerning union activites." *Id.* at 793. The threshold is not high for civil rights plaintiffs. The Supreme Court has held that a plaintiff who wins nominal damages in a civil rights suit is a prevailing party under 42 U.S.C. § 1988. *Farrar v. Hobby*, 506 U.S. 103 (1992).

Once a civil rights plaintiff crosses the prevailing party threshold, that party is generally entitled to some award of fees, absent special circumstances. *See Newman v Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968). Partial success on the merits is relevant to the *amount* of fees to which a plaintiff is entitled, not the plaintiff's entitlement to any fee at all. *Garland*, 489 U.S. at 790 ("[T]he degree of the plaintiff's success in relation to the other goals of the lawsuit is a

---

[1]      The Voting Rights Act contains a fee-shifting provision that is nearly identical to section 1988. 42 U.S.C. § 1973l(e). Courts construe these provisions consistently. *Leroy v. City of Houston*, 831 F.2d 576, 579 n.4 (5th Cir. 1987), *cert. denied*, 486 U.S. 1008 (1988).

factor critical to the determination of the size of a reasonable fee, not the eligibility for a fee award at all.").

For reasons we shall explain, we conclude that the Jackson plaintiffs, LULAC, and the GI Forum are prevailing parties for purposes of the fee-shifting statute. Each of these parties challenged the legality of Plan 1374C, albeit for a multitude of constitutional and statutory reasons. Moreover, each of these plaintiffs eventually obtained an enforceable judgment that altered the legal relationship between them and the state. This type of judgment is the touchstone for prevailing party status. At the same time, we conclude that none of these parties is entitled to all of their fees, or even most of them. Finally, we deny the Valdez-Cox plaintiffs' fee application. This court rendered a judgment against them, and they failed to perfect an appeal of the judgment, effectively abandoning their claims. They are not prevailing parties entitled to fees.

First, we address the Jackson plaintiffs' fee application. The Jackson plaintiffs point to their amended complaint, pre-and post-trial briefs, and the evidence they offered during the 2003 trial to support their application. They also contend that the Supreme Court's decision is attributable to their efforts. The Jackson plaintiffs concede they are not entitled to all of their fees, because they did not prevail on all of their claims. They have reduced their fees and costs by 2/3rds. The Jackson plaintiffs seek attorneys' fees in the amount of $352,946 and costs in the amount of $30,427.11.

The state challenges the Jackson plaintiffs' entitlement to fees. The state argues that any victory was a technical one, as the Supreme Court only found a violation in one of the thirty-two Congressional Districts. Moreover, the state argues that the Jackson plaintiffs did not prevail on the claims they pursued, which included (1) a challenge to mid-decade redistricting, (2) a challenge to the dilution of influence districts, and (3) a racial gerrymander challenge to CD 25. The state argues

that the Jackson plaintiffs focused primarily on a challenge to the plan as a whole and on an Equal

Protection theory directed toward CD 25. As the Supreme Court found only a Voting Rights Act

violation, the state urges that this holding defeats the Jackson plaintiffs' prevailing party status.

We heed the statements made by the *Balderas* court that "[r]edistricting litigation is not

ordinary civil rights litigation." *Balderas v. State of Texas*, 6:01-CV-158 Dkt. #499 (E.D. Tex.

February 20, 2002). Nevertheless, due in large part to the Supreme Court's generous formulation

of the prevailing party test, we determine that the Jackson plaintiffs prevailed. In their first amended

complaint, the Jackson plaintiffs brought claims on behalf of Richard Raymond, an Hispanic citizen

from Laredo, Texas who resided in CD 23 under Plan 1151C and in CD 23 under Plan 1374C. The

Jackson plaintiffs also brought claims on behalf of Maria Torres, an Hispanic citizen from McAllen,

Texas, who resided in CD 15 under Plan 1151C but in CD 25 under Plan 1374C. The Jackson

plaintiffs challenged the state's conduct with respect to District 23 and alleged that "[m]ore than

three hundred thousand Hispanics are left in proposed District 23 where they will have no chance

to elect their preferred candidates." (Dkt. # 46 at 16). The Jackson plaintiffs also alleged that "the

other Hispanic opportunity districts were drawn very irregularly, with extreme awareness of where

Hispanics live, and with the use of land bridges and relatively unpopulated connectors to 'rope

together' concentrations of Hispanic population." (Dkt. #46, at 16). The Jackson plaintiffs brought

claims under Section 2 and the Equal Protection Clause. (Dkt. #46 at 16-17).

In their pre-trial brief, the Jackson plaintiffs built on the allegations in their amended

complaint and urged that the state, by removing Hispanic Democrats from Webb County,

undermined the opportunity for Hispanic citizens in this region of Texas to elect their preferred

candidates to Congress. These plaintiffs urged: "That intentional cracking of the Hispanic

population violates Section 2 of the Voting Rights Act and the Equal Protection Clause." (Dkt. #115 at 18). The Jackson plaintiffs also elaborated on their equal protection challenge to CD25. Their brief argues that "the award for the oddest district would have to go to the new District 25, which starts in McAllen, in Hidalgo County, slides over to Starr County, and then snakes up through six barely contiguous and very sparsely populated counties before reaching into Travis County and pulling out Austin's most Hispanic neighborhoods." (Dkt. # 115 at 32). They maintained that the "bacon strip" districts triggered strict scrutiny because, "in each case, ethnicity predominated over traditional principles of compactness, respect for counties and municipalities, and respect for communities defined by actual shared interests (as opposed to 'communities' defined by nothing but ethnicity)." (Dkt. #115 at 33). The Jackson plaintiffs also offered evidence during the trial on these issues and reiterated the substance of their challenges in the post-trial briefing.

To be sure, the Jackson plaintiffs alleged several other claims in this litigation. They brought challenges to the authority of the state to redistrict mid-decade and brought challenges directed toward other districts in the state. The record, however, will not allow us to ignore the Jackson plaintiffs' pleadings, briefing, and evidence which challenged the treatment of Hispanic voters in South and West Texas. Consistent with what the Jackson plaintiffs had alleged, the Supreme Court found a Section 2 violation arising out of the removal of Hispanic voters from CD 23 and concluded that the state could not remedy that violation through the creation of CD 25. It is true, as the state argues, that the Supreme Court did not reach the Equal Protection claim asserted against District 25. But the short of the matter is that the Jackson plaintiffs challenged the legality of the districts in South and West Texas. At least in part as a result of their efforts, CD 23 and CD 25 of Plan 1374C no longer exist. The final judgment rendered in the case materially altered the legal relationship

6

between the state and the voters in both CD 23 and CD 25 under Plan 1374C. The Jackson plaintiffs are prevailing parties.

Next, we consider whether LULAC is a prevailing party in this litigation. In its first amended complaint, LULAC complained that Plan 1374C "fragmented cohesive Latino voters in Webb County" and eliminated an effective cohesive Latino district (CD 23) by reducing the Spanish surnamed voter registration rate below 50%. (Dkt. # 33 ¶¶ 15, 18). LULAC also alleged that Plan 1374C "purports to replace" the elimination of CD 23 with CD 25. According to LULAC, however, the creation of CD 25 was accomplished by "unnecessarily fragmenting Latino voter communities in Hidalgo County, Cameron County, and Travis County." (Dkt. #33 ¶ 18).

LULAC elaborated on its CD 23 allegations in its pre-trial briefs. In its pre-trial papers, LULAC challenged the cracking of "a cohesive Latino community–Laredo, Webb County, Texas." (Dkt. # 98 at 8). LULAC also argued that no legitimate state policy supported the creation of some of the districts. In connection with this argument, LULAC maintained that the link between the Austin and the Rio Grande Valley segments in Districts 15 and 25 was based only on racial considerations. In support of this position, LULAC pointed to the testimony of Dr. Gaddie, the state's expert: "Indeed, Dr. Gaddie, who has written extensively on the subjects of regionalism in Texas, could not point to a single example of a context in which Austin and the Rio Grande Valley have ever previously been considered a community of interest . . . ." (Dkt. # 98, at 19). These allegations supported LULAC's claim that the state violated Section 2 of the Voting Rights Act. Although LULAC's post-trial brief urges the court to strike Plan 1374C as a whole and order elections under Plan 1151C, the basis for LULAC's position was unlawful vote dilution directed toward Hispanics and African-Americans. As we have noted, the judgment rendered in this case

7

found that the state violated Section 2 when it re-drew CD 23. The creation of CD 25 did not compensate for the loss of CD 23 for essentially the reasons urged by LULAC. LULAC is a prevailing party.

Third, the court addresses GI Forum's fee petition. The GI Forum challenged Plan 1374C because it created no Latino majority congressional districts in the Dallas area and drew only 6 (as opposed to 7) effective districts in South and West Texas. (Dkt. # 39, ¶¶ 18, 20-25). In addition, however, the GI Forum specifically challenged the state's conduct in CD 23, by alleging that "[t]he new Texas congressional redistricting plan intentionally discriminates against Latino voters by reducing the Latino population and voting strength in Congressional District 23 in order to prevent Latino voters from being able to elect their candidate of choice." (Dkt. #39, ¶ 26). For its causes of action, the GI Forum alleged that the state violated Section 2 of the Voting Rights Act in connection with its statewide plan, and also "because it intentionally reduces the Latino population and voting strength of Congressional District 23 in violation of 42 U.S.C. Sections 1971(a) and 1973 and the Fourteenth and Fifteenth Amendments of the U.S. Constitution." (Dkt # 39, ¶¶ 28-29).

In the portion of its pre-trial brief devoted to intentional discrimination, the GI Forum contended that the state had intentionally reduced the Latino population in CD 23 to ensure the re-election of a candidate who is not preferred by the majority of Latino voters in the district. (Dkt # 108 at 12). In the context of the Section 2 claim, the GI Forum argued that "[i]n South and West Texas, Plan 1374C completely eliminates Congressional District 23 as a district that offers Latino voters the opportunity to elect their candidate of choice." (Dkt. #108 at 2). The GI Forum criticized Plan 1374C because it divided Webb County, and the City of Laredo, in half. (Dkt. #108 at 2). The GI Forum urged that "[t]his new boundary effectively cripples Webb County and ensures that its

Latino voters can no longer cast their block of votes for the Latino candidate of choice . . . ." (Dkt. # 108 at 2). The GI Forum also maintained that the State could not offset the loss of CD 23 with CD 25. (Dkt #108 at 9-10). GI Forum devoted a substantial portion of its trial presentation and its post-trial brief to its argument that the state had improperly reduced the number of Latinos in CD 23 to ensure the re-election of Representative Henry Bonilla.

For essentially the same reasons identified in connection with the Jackson plaintiffs and LULAC, the final judgment in this case altered the legal relationship between the state and the GI Forum. It bears mention that Justice Kennedy's opinion finding a Section 2 violation emphasized that the state's conduct in connection with CD 23 bore the mark of intentional discrimination. The GI Forum is a prevailing party.

Finally, the court turns to the application submitted by the Valdez-Cox plaintiffs. Unlike the other applicants, the Valdez-Cox plaintiffs did not participate in this case after the trial on the merits. As the state observes, the Valdez-Cox plaintiffs abandoned pursuit of their claims, did not file any briefing with the Supreme Court, and did not participate in the remedial phase of this litigation. It is fair to state that the Valdez-Cox plaintiffs abandoned their claims. The court rejects the argument that the Valdez-Cox plaintiffs aided the construction of an evidentiary record on which the Supreme Court could base its decision. Rather, we find that any contribution to the record was cumulative of the efforts of other parties. The Valdez-Cox plaintiffs are not prevailing parties.

We have concluded that the Jackson plaintiffs, LULAC, and the GI Forum plaintiffs are prevailing parties. We now address an appropriate amount to award as attorneys' fees. We have considered all of the applications in light of our collective experience with the parties and the case.

9

A reasonable fee for each prevailing party is 25% of the party's total fees.[2]

We begin with the Jackson plaintiffs. This group seeks only 1/3 of the total fees billed in this case. Experience tells us, however, that the primary relief sought by the Jackson plaintiffs was the invalidation of the state's plan as a whole. These plaintiffs sought a rule of law banning mid-decade redistricting for purely partisan purposes. Moreover, these plaintiffs devoted a considerable amount of trial time challenging the state's conduct in the Dallas/Fort Worth area and in other "influence" districts across the state. These claims, viewed collectively, vastly overshadowed the Jackson plaintiffs' efforts in South and West Texas. Their attempt to recover a full third of their fees and costs is too aggressive in the context of this case. We find that 25% of the hours billed are reasonable in light of the result obtained. We further find that the rates are reasonable and customary for this type of work. We award them $264,709.75 in attorneys' fees and $22,820.33 in costs.

LULAC seeks all of its fees in the amount of $946,064, costs in the amount of $34,739.89,

---

[2]     We first "calculate[d] a lodestar fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir. 1999). We also considered whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case, and the factors set forth in *Johnson v. Ga. Highway Express, Inc*, 488 F.2d 714 (5th Cir. 1974).

The *Johnson* factors are: (1) the time and labor required to litigate the matter; (2) the novelty and complicatedness of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case imposed time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) whether the case was "undesirable"; (11) the type of attorney-client relationship and whether the relationship was long-standing; and (12) awards made in similar cases. *Id.* at 717-19.

To the extent that any *Johnson* factors were subsumed in the lodestar, we did not reconsider them when we determined whether any adjustment to the lodestar was required. *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998).

and also a multiplier for "exceptional success." LULAC aided in the efforts to challenge the districts in South and West Texas. At the same time, however, LULAC was preoccupied with its statewide challenge and its desire to create additional Latino opportunity districts. We treat LULAC like we treat the Jackson plaintiffs and award 25% of its fees. No multiplier is appropriate under the *Johnson* factors. LULAC is awarded $236,516 in attorneys' fees and $8684.97 in costs.

Finally, the GI Forum seeks fees in the total amount of $650,407.50 and costs in the total amount of $134,872.02. The GI Forum also seeks a fee multiplier. Although the GI Forum is correct that it focused exclusively on the Latino vote dilution in South and West Texas, this court rejected the GI Forum's primary goal to create a seventh Latino opportunity district in South or West Texas. The GI Forum plaintiffs devoted much of their attention, however, to the state's conduct in CD 23, and we recognize those efforts. Nevertheless, we reduce their fees because they achieved only partial success on the merits of their claims. We intend no criticism of the GI Forum's effort. We must recognize, however, that many parties contributed to a Supreme Court decision that awarded complete relief to none. We allow the GI Forum 25% of its fees and costs. We determine that no multiplier is appropriate. The GI Forum plaintiffs are entitled to recover $196,319.88 in fees and $33,718 in costs.

4.    **Conclusion.**

We grant in part and deny in part the Jackson plaintiffs' application for attorneys' fees (##354, 355), LULAC's application for attorneys' fees (#340), and the GI Forum's application for attorneys' fees (#356). We deny the Valdez-Cox plaintiffs' application for attorneys' fees (#350).

So **ORDERED** and **SIGNED** this 28th day of March, 2007.

PATRICK E. HIGGINBOTHAM
UNITED STATES CIRCUIT JUDGE

LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

T. JOHN WARD
UNITED STATES DISTRICT JUDGE

12